## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ALEXIS SUGGS, | ) | Civil Action No. |
| | ) | |
| *Plaintiff*, | ) | Judge: |
| | ) | |
| v. | ) | Magistrate Judge: |
| | ) | |
| ALEX MIKKELSEN, JONATHAN DOWNING, | ) | **COMPLAINT** |
| MICHAEL JOHN NACCARI III, KERRY | ) | |
| NAJOLIA, and JOSEPH P. LOPINTO III, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## I.    COMPLAINT

COMES NOW Plaintiff Alexis Suggs ("Mrs. Suggs"), by and through her undersigned counsel, and for her Complaint against Defendants Alex Mikkelsen ("Defendant Mikkelsen"), Jonathan Downing ("Defendant Downing"), Michael John Naccari III ("Defendant Naccari") (collectively, Defendant Mikkelsen, Defendant Downing, and Defendant Naccari are the "Individual Defendants"), Kerry Najolia ("Defendant Najolia"), and Joseph P. Lopinto III ("Defendant Lopinto"), she hereby states and alleges as follows:

## II.    INTRODUCTION

1.      This case arises out of the unreasonable search and seizures Mrs. Suggs was subjected to while driving one evening to get pizza on a date night with her now-husband. The police pulled over Mrs. Suggs and told her she had been stopped for failing to signal a turn. But that was impossible. Mrs. Suggs had been driving straight for several minutes so there had been no turn to signal. The police stopped Mrs. Suggs arbitrarily, detained her excessively, thoroughly searched her purse, and seized her personal items, all without basis, and all the while treated her with disrespect and disdain.

2.      This type of behavior by those entrusted to protect and serve is simply

unacceptable in a free and civil society that aspires to equality and respect for all people.  This

case is about police accountability and holding law enforcement officers and the police

departments that oversee them responsible when they violate the people's rights with impunity.

3.      The Fourth Amendment to the U.S. Constitution mandates that the "right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures, shall not be violated . . . ."  U.S. CONST. amend. IV.  The right to be free from

arbitrary traffic stops has been clearly established for many decades.  *Delaware v. Prouse*, 440

U.S. 648, 663 (1979) (holding that a random traffic stop without articulable or reasonable

suspicion that a violation of law has occurred is constitutionally impermissible and violative of

the Fourth Amendment).  The Supreme Court long ago recognized that Fourth Amendment

protection against unreasonable searches and seizures extends to vehicles.  *Id.*  Law

enforcement officers act unreasonably and unconstitutionally when they detain vehicles without

objectively reasonable suspicion based on articulable facts.  Indeed, it is clearly established that

traffic stops may not be performed based on an officer's mere hunch.  *Id.* at 661.  And it is

clearly established that even a lawful traffic stop may last no longer than is necessary to

effectuate its purpose.  *Rodriguez v. United States*, 575 U.S. 348, 356-57 (2015).

4.      Also clearly established is the Fourth Amendment protection to be free of law

enforcement searches and seizures of personal property when no warrant based on probable

cause has been issued and no exception to the warrant requirement applies.  *United States v.

Place*, 462 U.S. 696, 701 (1983); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

5.      The Individual Defendants' conduct in stopping Mrs. Suggs for no legitimate

reason was objectively unreasonable.  The Individual Defendants did not have reasonable

suspicion that Mrs. Suggs had done anything wrong.  The Individual Defendants also lacked any warrant, probable cause, or reasonable suspicion to extend her detention, to search her purse, or to seize her personal property.

6.      The series of violations of Mrs. Suggs's Fourth Amendment rights by law enforcement was the result of Defendant Najolia's and Defendant Lopinto's official policies, customs or practices, as created and implemented by them.  Neither Defendant Najolia nor Defendant Lopinto provided their officers/deputies with training in properly initiating and conducting traffic stops and related searches and seizures within the bounds of the Fourth Amendment.  They also failed to adequately supervise their officers/deputies, including those known to have engaged in police misconduct.  The custom of not disciplining employees who violate policies, and not investigating complaints of misconduct in connection with traffic stops, reflects those policymakers' deliberate indifference to citizens' Fourth Amendment rights, and resulted in the Individual Defendants' acting with impunity.

### III.      PARTIES

7.      Plaintiff Alexis Suggs (née Alexis Walker) is an individual who resides in Georgia.

8.      Defendant Alex Mikkelsen was, at all relevant times herein, an officer with the East Jefferson Levee District Police Department ("EJLD PD") acting and/or neglecting to act in the course and scope of his employment and under color of state law.  He is sued in his individual capacity.

9.      Defendant Jonathan Downing was, at all relevant times herein, an officer with the EJLD PD acting and/or neglecting to act in the course and scope of his employment and under color of state law.  He is sued in his individual capacity.

10.    Defendant Michael John Naccari III was, at all relevant times herein, a deputy with the Jefferson Parish Sheriff's Office ("JPSO") acting and/or neglecting to act in the course and scope of his employment and under color of state law.  He is sued in his individual capacity.

11.    Defendant Kerry Najolia is the Superintendent of Police of EJLD PD and is the principal and final policymaker of the EJLD PD, responsible for the hiring, firing, training, supervising, and establishing the policies, procedures, customs and practices governing Defendant Mikkelsen's and Defendant Downing's conduct while on duty.  Defendant Najolia and the EJLD PD at all times relevant hereto employed Defendant Mikkelsen and Defendant Downing.  Defendant Najolia was, at all relevant times herein, the Superintendent of the EJLD PD acting and/or neglecting to act in the course and scope of his employment and under color of state law.  He is sued in his individual capacity and in his official capacity.

12.    Defendant Joseph P. Lopinto III is the Sheriff of JPSO and is the principal and final policymaker of the JPSO, responsible for the hiring, firing, training, supervising, and establishing the policies, procedures, customs and practices governing Defendant Naccari's conduct while on duty.  Defendant Lopinto and the JPSO at all times relevant hereto employed Defendant Naccari.  Defendant Lopinto was, at all relevant times herein, the Sheriff of the JPSO acting and/or neglecting to act in the course and scope of his employment and under color of state law.  He is sued in his individual capacity and in his official capacity.

## IV.    JURISDICTION AND VENUE

13.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343 because Mrs. Suggs's claims arise under the Constitution and laws of the United States, including under 28 U.S.C. §§ 1983 and 1988 seeking redress for violations of her civil rights.

14.     This Court has supplemental jurisdiction over all other claims asserted under the laws of the State of Louisiana pursuant to 28 U.S.C. § 1367 because they arise out of the same operative facts and are so related to the federal claims that they are part of the same case or controversy.

15.     Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Mrs. Suggs's claims occurred in the Eastern District of Louisiana and Metairie, where the unlawful incident took place, is in the Eastern District of Louisiana.  On information and belief, the Individual Defendants, Defendant Najolia, and Defendant Lopinto are all residents of the Eastern District of Louisiana.  Venue is thus also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because these Defendants reside in this district.

16.     Declaratory relief is authorized by 28 U.S.C. § 2201.  A declaration of law is necessary to determine the respective rights and duties of the parties.

## V.     FACTUAL ALLEGATIONS

### A.     The Unlawful Stop, Search, and Seizure of Mrs. Suggs

17.     On the evening of Saturday, July 18, 2020, Mrs. Suggs and her then-fiancé Terrell Suggs ("Mr. Suggs") were on a date and headed to grab pizza at the Pizza Hut located at 2312 David Drive in Metairie, Louisiana.  Mrs. Suggs was driving, and Mr. Suggs was sitting in the passenger seat of Mrs. Suggs's black Nissan Rogue vehicle.

18.     As of July 18, 2020, Mrs. Suggs had been a commercial driver for approximately 15 years.  She obtained her commercial driver's license in 2006.  She had not received a single traffic ticket since obtaining her commercial driver's license.  Mrs. Suggs knew that her job depended on having a clean driving record so she is extra careful when

driving.

19.     Prior to July 18, 2020, Mrs. Suggs was familiar with the general area where she was driving with Mr. Suggs to get pizza because she used to live in the area.  Having heard that police often pulled people over on Little Farms Avenue, Mrs. Suggs generally avoided it.  But on this night, it was late and taking Little Farms Avenue was the most direct route from Mr. Suggs's home to the Pizza Hut on David Drive.  Mrs. Suggs decided to take the shortest route and drive extra carefully.

20.     To get to the Pizza Hut, Mrs. Suggs left with Mr. Suggs from his home and drove for a time on Jefferson Highway.  Mrs. Suggs exited Jefferson Highway and, after stopping at the stop sign and signaling, turned left.  She continued to drive straight on Little Farms Avenue, without any turns, for approximately 2,000 feet – or nearly half a mile.

21.     The map below, taken from a screen capture of Google Maps, shows Mrs. Suggs's route on the evening of July 18, 2020:



22.     While nearing the intersection of Little Farms Avenue and Ivy Street, and while still driving straight on Little Farms Avenue, Mrs. Suggs noticed police lights and two police cars.  She pulled over on the right side of Little Farms Avenue, just beyond the railroad tracks, and put her vehicle in the park position.  The time of the stop was approximately 11:18 p.m.

23.     The officers that stopped Mrs. Suggs were Defendant Mikkelsen and Defendant Downing from the EJLD PD, and Defendant Naccari from the JPSO.

24.     Defendant Mikkelsen has been with the EJLD PD since April 27, 2020.  Prior to working at the EJLD PD, he was employed by the New Orleans Police Department ("NOPD") from October 30, 2016 to July 17, 2019.  Defendant Mikkelsen self-reported he was previously fired from this job, stating that he was "Terminated for Violation of Policy."  Although he reported on his application to work at the EJLD PD a singular "Violation" of NOPD policy, a reference check conducted by the EJLD PD revealed that Defendant Mikkelsen had been fired from the NOPD due to "*Multiple sustained violations* of Policy which led to dismissal" (emphasis added).

25.     Defendant Mikkelsen's multiple sustained violations included an unauthorized high-speed chase in March 2019 that led to the death of three people, two of whom were minors.  Prior to this, Defendant Mikkelsen had been involved in at least *two* other similar incidents.

26.     Despite Defendant Mikkelsen's unsettling history of violating department policy that led to his termination from the NOPD, of which Defendant Najolia was aware due to a reference check by EJLD PD staff and widespread media reports,[1] Defendant Najolia nevertheless decided to matriculate Defendant Mikkelsen to the EJLD PD's ranks.

---

[1] *See, e.g.*, WWLTV.com, *4 NOPD officers fired, 2 more suspended after investigation into Unity-1 Salon crash*, FIRST COAST NEWS (July 17, 2019),

(continued...)

27.     On the evening of July 18, 2020, after the Individual Defendants all pulled over Mrs. and Mr. Suggs, one of the Defendants, upon information and belief Defendant Naccari, came up to Mrs. Suggs's window while Defendant Mikkelsen and Defendant Downing approached the passenger side window.  All of the Individual Defendants were shining flashlights into the car.

28.     Defendant Naccari approached the driver's side window with his hand on his belt near his gun and immediately began behaving in an unprofessional and disrespectful manner.  He asked Mrs. Suggs whether she was on drugs, whether she had any weapons in the car, where she was going, and why she was driving in the area.

29.     In response to his questions, Mrs. Suggs truthfully stated that she was not on any drugs and that she did have a registered gun in the car.  She explained she was headed to Pizza Hut.

30.     Defendant Naccari asked Mrs. Suggs where her gun was located.  She responded that the registered gun was in her purse.  The purse was located in the back of the car on the floor of the passenger's side, and the zipper was closed.  Unable to see Mrs. Suggs's gun or purse in his field of vision, Defendant Naccari shined a flashlight in the window of Mrs. Suggs's car.  He asked her where the purse was.  Mrs. Suggs responded that it was in the back of the car.  Defendant Naccari demanded that Mrs. Suggs hand him the purse.  Believing she had no choice, Mrs. Suggs reached back to retrieve her purse, handed it to Defendant Naccari, and told him loudly, "Do not go into my purse without me being present."

---

https://www.firstcoastnews.com/article/news/4-nopd-officers-fired-2-more-suspended-after-investigation-into-unity-1-salon-crash/289-c2d50fec-7f46-426f-8f9d-a862c5d9f847.

31.     Before handing the purse over, Mrs. Suggs confirmed the zipper of the purse was fully closed.

32.     Mrs. Suggs did not give any of the Individual Defendants consent to search her purse.

33.     The Individual Defendants had no reason to believe Mrs. Suggs was dangerous.

34.     The Individual Defendants had no reason to believe that Mrs. Suggs was in possession of evidence of a crime.

35.     Defendant Naccari took Mrs. Suggs's purse, holding it by his fingertips as if in disgust that he was touching it, and walked away behind her car where she could not see him. One or more of the Individual Defendants searched Mrs. Suggs's purse.  Mrs. Suggs sat in the car while her purse was being searched and could not see the search taking place.

36.     The purse search was thorough and lasted significantly longer than necessary to remove a gun.

37.     While Defendant Naccari was initially questioning Mrs. Suggs, the other two Defendants, upon information and belief Defendant Mikkelsen and Defendant Downing, approached the passenger's side of the vehicle, where Mr. Suggs was seated.  They shined flashlights into the car and had their hands on their guns.  Defendant Mikkelsen and Defendant Downing did not ask Mr. Suggs to identify himself or provide any other basic information but instead asked whether Mr. Suggs had been doing drugs, whether he or Mrs. Suggs had any weapons, and whether Mrs. Suggs had been drinking.  Mr. Suggs cooperated and responded to the questions.

38.     Defendant Mikkelsen and Defendant Downing then instructed Mr. Suggs to step out of the vehicle.  He complied.  Defendant Mikkelsen and Defendant Downing then jointly

subjected Mr. Suggs to a pat down search on the back of the car, which included a thorough
search of his pockets.  During the search these Defendants forcefully clutched Mr. Suggs's
arms, apparently in an effort to keep him from attempting to resist, even though Mr. Suggs was
cooperating.  They found no weapons, drugs, or contraband.

39.     Upon information and belief, the Individual Defendants immediately questioned
Mrs. and Mr. Suggs regarding drugs and weapons, without even asking for identification first,
and then patted down Mr. Suggs and searched his pockets, and searched Mrs. Suggs's purse,
because they were trying to find incriminating evidence.

40.     The Individual Defendants did not have reasonable suspicion to initiate the stop
and instead attempted to find justification for the illegal stop after the fact.

41.     A few minutes after Defendant Naccari walked off with Mrs. Suggs's purse, he
returned to the driver's side window and asked for Mrs. Suggs's driver's license and other
paperwork.  She complied and Defendant Naccari told Mrs. Suggs that she could get out of the
car.  When Mrs. Suggs exited the vehicle, she saw that one of the other Individual Defendants
had her gun outside of the purse.  One of the Individual Defendants had the gun with him inside
a police car and Mrs. Suggs's purse was on top of the hood of a police truck.

42.     One of the Individual Defendants, upon information and belief Defendant
Downing, then started holding the gun using a pen or pencil and walked toward Mrs. Suggs's
car trunk.  He was holding the gun like he was disgusted by it.  He walked with the gun to the
trunk of Mrs. Suggs's car, touching the trunk, and was about to open it, but Mrs. Suggs
protested, asking what was the rationale for putting the gun in the trunk of her car when the
Individual Defendants took it from her purse.  Upon information and belief, Defendant
Downing attempted to put the gun in the trunk so that he could see the contents of Mrs. Suggs's

trunk, again in the hope of finding incriminating evidence.  Defendant Downing then walked back to the police truck and dropped the gun into Mrs. Suggs's purse.

43.     Mrs. Suggs discovered the next day that although the Individual Defendants returned her gun, they had taken two or three (but not all) of the bullets from her gun.  She also realized that the Individual Defendants never gave her back her valid Georgia driver's license. The taking of Mrs. Suggs's bullets and driver's license was yet another violation of Mrs. Suggs's Fourth Amendment rights.

44.     During the incident Mrs. Suggs repeatedly asked why she had been pulled over. At some point one of the Individual Defendants said that she had not used her signal.

45.     Mrs. Suggs was incredulous.  She had been driving on Little Farms Avenue, a straight road, for several minutes so there had been no need to signal anywhere after she turned onto Little Farms Avenue.  She told one of the Individual Defendants that failing to signal a turn was not possible since she had been driving straight on Little Farms Avenue for some time.  He did not respond verbally.  Instead, he smirked at Mrs. Suggs and then looked at the other Individual Defendants and smiled.

46.     Mrs. Suggs returned to her car where one of the Individual Defendants presented her with tickets for failure to signal a turn, expired vehicle insurance, and lack of vehicle registration.  The Individual Defendants had no knowledge about the status of Mrs. Suggs's insurance and registration prior to the stop.

47.     Mrs. Suggs informed the Individual Defendants she would not sign the tickets because she did not agree with what they said.

48.    The Individual Defendants told Mrs. Suggs they could arrest her if she did not sign the tickets, and that she could go to jail.  Mrs. Suggs continued advocating for herself over the invalidity of the stop.  For fear of being arrested, Mrs. Suggs made a mark on the tickets.

49.    To date, no one, not any of the Individual Officers, Defendant Najolia, nor Defendant Lopinto, has returned any of Mrs. Suggs's property that was seized during the stop, despite multiple requests.  Mrs. Suggs had to obtain a new driver's license, at her own expense, in order to try to continue pursuing her livelihood as a commercial driver.  But because of the unlawful stop, Mrs. Suggs lost her job and has not been able to find steady employment since.

50.    The duration of the traffic stop was approximately forty to forty-five minutes in total.  Forty to forty-five minutes is an unreasonable length of time to conduct a traffic stop for allegedly failing to signal a turn.  The traffic stop was unreasonable to begin with because the Individual Defendants lacked reasonable suspicion to stop Mrs. Suggs, and the stop continued to violate Mrs. Suggs's Fourth Amendment rights since it was unreasonably extended without lawful justification.  The stop was extended unlawfully by the warrantless pat-down and pocket search of Mr. Suggs without probable cause or reasonable suspicion of any criminal activity. The stop also was extended unlawfully by the warrantless search of Mrs. Suggs's purse, which was conducted without probable cause, reasonable suspicion of any criminal activity, or reasonable fear that Mrs. Suggs was dangerous and an immediate threat.

**B.    Racial Profiling in Louisiana and its Impact on Mrs. Suggs**

51.    Upon information and belief, the Individual Defendants repeatedly violated Mrs. and Mr. Suggs's Fourth Amendment rights because Mrs. and Mr. Suggs are Black Americans. This is evidenced by, among other things, the Individual Defendants' questioning of Mrs. and Mr. Suggs about drugs and weapons upon first approaching the vehicle for an alleged routine

traffic stop.  Upon information and belief, these questions were racially motivated and reflect the Individual Defendants' racial stereotyping rooted in the history of criminalization of Black people in Louisiana.[2]

52.     The area of Metairie, in Jefferson Parish, Louisiana, is predominantly white. According to U.S. Census statistics, based on one-year estimates of data provided in the American Community Survey for the year 2019, Metairie is approximately 81.5% white.[3]  Only around 10.5% of the population in Metairie was Black or African American as of 2019.[4]

53.     The area of Metairie, Louisiana is known for racial profiling by police.[5]  Mrs. Suggs was aware of this fact, which is why she usually avoided driving through that neighborhood.

54.     The practice of racial profiling, which is based only on a person's skin color and not on any reasonable suspicion, plagues the United States.[6]  In this country, Black adults are

---

[2] See, e.g., J. Michael Kennedy, *Sheriff Rescinds Order to Stop Blacks in White Areas*, LA TIMES (Dec. 4, 1986), https://www.latimes.com/archives/la-xpm-1986-12-04-mn-1380-story.html (explaining that the then-sheriff of Jefferson Parish Sheriff's Office reportedly said, "If there are some young blacks driving a car late at night in a predominantly white area, they will be stopped . . . . If you live in a predominantly white area and two blacks are in a car behind you, there's a pretty good chance they're up to no good.").

[3] ACS Demographic and Housing Estimates, 2019, U.S. CENSUS, https://data.census.gov/cedsci/table?q=metairie%20louisiana&tid=ACSDP1Y2019.DP05 (last visited May 27, 2021).

[4] *Id.*

[5] See Kennedy, *supra* note 2.

[6] Drew DeSilver, Michael Lipka & Dalia Fahmy, *10 things we know about race and policing in the U.S.*, PEW RESEARCH CENTER (June 3, 2020), https://www.pewresearch.org/fact-tank/2020/06/03/10-things-we-know-about-race-and-policing-in-the-u-s/ ("Majorities of both black and white Americans say black people are treated less fairly than whites in dealing with the police and by the criminal justice system as a whole.").

about five times more likely than whites to say they have been unfairly stopped by police because of their race or ethnicity.[7]

55.     In an effort to address racial policing in Louisiana, the Louisiana Legislature requires law enforcement agencies to either adopt a written policy against racial profiling or to submit data about traffic citations to the Louisiana Department of Public Safety and Corrections.[8]

56.     The EJLD PD has adopted a two-sentence policy that fails to provide examples of racial profiling prohibited by the policy, and upon information and belief Defendant Najolia does not conduct any training on the policy.  JPSO has adopted a racial profiling policy that, among other things, requires initial and ongoing training, but upon information and belief Defendant Lopinto has failed to conduct any such training, let alone any "ongoing" training.

57.     During the incident, Mrs. Suggs asked Defendant Naccari if she had been pulled over because of her race.  Defendant Naccari responded to the effect of: "I don't want to hear that; all you are saying that lately."

58.     After the stop, Mrs. and Mr. Suggs sat in Mrs. Suggs's car for approximately ten minutes, needing to compose themselves.  Mrs. Suggs was in shock.  This was the only time that she had been racially profiled.  Mrs. Suggs broke down emotionally and mentally.  As a result of the illegal stop, and the searches and seizures, Mrs. Suggs felt assaulted and traumatized by the Individual Defendants' animosity, insolence, and inequitable behavior.

59.     Mrs. and Mr. Suggs did go to get pizza at Pizza Hut after they had a chance to regain a bit of composure.  Mrs. Suggs drove back to Mr. Suggs's home afterwards.  But Mrs.

---

[7] *Id.*

[8] *See* La. R.S. 32:398.10.

Suggs did not take the same route.  Mrs. Suggs has nightmares about the stop on Little Farms Avenue and does not drive on the street anymore.  She was so distraught that she dropped off Mr. Suggs and went back to her place in Louisiana, where she took a shower and she was very upset, crying, nervous, and could not sleep.  The Individual Defendants' flagrant violations of Mrs. Suggs's Fourth Amendment rights by conducting an unreasonable stop, impermissibly extending it, illegally searching through her purse, and unlawfully seizing Mrs. Suggs's private property have resulted in Mrs. Suggs's ongoing feelings of despair and displacement.  Among other things, Mrs. Suggs does not feel she can be in the same area again and avoids it out of fear of a repeat similar racial profiling encounter with police.

### C.    The Individual Defendants' Multiple Policy Violations

60.    Not only did the Individual Defendants violate Mrs. Suggs's constitutional rights, they also violated numerous police policies.

61.    As of January 2, 2002, Defendant Najolia and the EJLD PD had a property and evidence depository policy, Standard Operating Procedure ("SOP") 2.7.  The purpose of the policy is to "ensure the security of property and evidence from tampering and or theft."  The policy mandates that evidence gathered during a police encounter should be placed into a property room and an itemized chain of custody report must be completed.  The property or evidence seized must be tagged with a tag or sticker.  The chain of custody report must be turned in to the appropriate custodian, who will place the property or evidence into storage and log the item into an evidence book.  The chain of custody is to be filed when completed.  Defendant Lopinto and the JPSO also have an evidence preservation policy.

62.    After taking Mrs. Suggs's bullets and license, the Individual Defendants did not place the bullets or license into EJLD PD's or JPSO's property rooms, nor did they generate

any chain of custody reports.  No chain of custody report was submitted to any custodian, and no chain of custody was filed.

63.     As of May 23, 2001, Defendant Najolia and the EJLD PD had a property and evidence disposal policy, outlined in SOP 1.22.  SOP 1.22 states: "Property held as evidence must have a closed item number and the disposition of pending case final.  If said property is to be disposed, attempts to contact the owners must be made to return the items.  If no claim is made or no contact is made and the case has been disposed of then the evidence may be disposed."  Upon information and belief Defendant Lopinto and the JPSO have a similar policy.

64.     The Individual Defendants never placed any item number on Mrs. Suggs's bullets or license.  Even though Mrs. and Mr. Suggs both reported the missing bullets and documentation, no one at either EJLD PD or JPSO, and neither of Defendant Najolia nor Defendant Lopinto, contacted Mrs. Suggs to return any of her seized property.

65.     Defendant Najolia's and EJLD PD's Code of Conduct, Title III, Chapter F, Article 87, effective as of August 18, 1997, dictates that "[o]fficers shall not convert to their own use, manufacture, conceal, falsify, remove, destroy, tamper with or withhold any property or evidence in connection with an investigation or other police action."  Upon information and belief, Defendant Lopinto and the JPSO have a similar policy.  The Individual Defendants violated these policies by converting Mrs. Suggs's bullets and driver's license.

66.     Defendant Najolia did not hold Defendant Mikkelsen or Defendant Downing accountable through any disciplinary action for the conversion of Mrs. Suggs's property.  Similarly, Defendant Lopinto did not hold Defendant Naccari accountable through any disciplinary action for the conversion of Mrs. Suggs's property.

67.     EJLD PD's SOP 2.3, effective August 7, 1998, states it is "the policy of the [EJLD PD] that each officer during their tour of duty will complete an activity sheet.  The activity sheet will reflect a chronological order of the officer's patrol activity during the officer's shift.  This activity will include . . . all calls for service, whether reactive or proactive. All law enforcement action will be reflected on the activity sheet and the proper paperwork for that action turned in at the end of the day."  Defendant Mikkelsen and Defendant Downing did not submit a daily activity sheet for the date July 18, 2020.  They did not write contemporaneous accounts of Mrs. Suggs's traffic stop.  They did not record a call for service when they called Defendant Naccari.  The lack of records, in violation of EJLD PD policy, allows Defendant Mikkelsen and Defendant Downing to construct any narrative about the encounter with Mrs. and Mr. Suggs after the fact without fear that their version of events will be contradicted by the contemporaneous records.  Defendant Najolia's failure to supervise Defendant Mikkelsen and Defendant Downing, including failure to oversee them on proper record-keeping, shows Defendant Najolia's ongoing policy of failure to train, as well as his negligence in training, supervising, and disciplining EJLD PD employees.

68.     EJLD PD's policy on traffic and field stops, SOP 2.9, effective May 1, 2003, imposes the following requirements on police officers: "Before initiating a stop in the field, whether traffic or pedestrian, officers will contact central dispatch via police radio and give a signal, description of the vehicle or pedestrian and their location."  Defendant Mikkelsen and Defendant Downing did not provide any description of Mrs. Suggs's vehicle or Mrs. Suggs's location when contacting central dispatch.  They did not report a reason for stopping and detaining Mrs. Suggs.

69.     EJLD PD's SOP 2.9 further requires the officers to complete "a Miscellaneous Incident Card filling out as much information as possible on the vehicle[]."  Defendant Mikkelsen and Defendant Downing did not fill out a Miscellaneous Incident Card about the encounter with Mrs. Suggs.  In failing to do so, they did not meet the standard of care owed to individuals subject to a traffic stop.  Defendant Najolia failed to discipline Defendant Mikkelsen and Defendant Downing for not following department policy on traffic stops, again failing to properly supervise and discipline these officers.

70.     Upon information and belief, Defendant Najolia does not have any training program on how police officers should conduct traffic stops without violating the Fourth Amendment.  EJLD PD's training for its police officers, as outlined in its SOPs, is limited to physical assessments or firearms training.  Given that EJLD PD has issued approximately 2,691 traffic tickets in the past six years, due to the frequency of traffic stops, Defendant Najolia has been on notice of the inevitable potential for traffic stop abuses by the EJLD PD police force.  Yet, records provided by EJLD PD reflect that neither Defendant Mikkelsen nor Defendant Downing have completed any traffic stop training organized by Defendant Najolia.  Neither Defendant Mikkelsen nor Defendant Downing have any traffic stop training completion certificates from EJLD PD.  In effect, Defendant Najolia has instituted an official policy of failing to train police officers in the Fourth Amendment protections offered to individuals subject to traffic stops.

71.     Defendant Naccari also violated additional policies.  JPSO's SOP 20 states that "[w]hen making a vehicle stop, the officer should notify the dispatcher of as much of the following information as possible . . . [including] [t]he reason for the stop."  In failing to collect

any information pertaining to the reason for Mrs. Suggs's stop, Defendant Naccari violated this policy.  Defendant Naccari did not inform the dispatcher of the reason for the stop.

72.     Even though JPSO has a traffic stop policy, upon information and belief, Defendant Lopinto has not put into effect any training programs to implement this policy and ensure that deputies understand Fourth Amendment limits on searches and seizures in connection with traffic stops.  JPSO's records from April 27, 2018 through January 21, 2021 reflect that Defendant Naccari did not complete any traffic stop training program offered by Defendant Lopinto or the JPSO.  No such training program was offered by Defendant Lopinto or the JPSO.  Defendant Lopinto has therefore created an official policy of failing to train his deputies on proper traffic stop procedures that would be compliant with the Fourth Amendment.  The failure to train policy is especially egregious given the frequency with which JPSO deputies conduct traffic stops: in 2019 and 2020, JPSO deputies issued approximately 1,840 traffic summonses and tickets.

73.     JPSO has a racial profiling policy, SOP 34, which states that "racial, ethnic, religious affiliation and gender-based profiling in the Jefferson Parish Sheriff's Office are totally unacceptable . . . ."  The policy goes on to state that "citizens will only be stopped or detained when there exists reasonable suspicion to believe they have committed, are committing, or are about to commit, an infraction of the law" and that "[t]he Jefferson Parish Sheriff's Office is charged with protecting the rights for all, regardless of race, color, ethnicity, sex, sexual orientation, physical handicap, religion or other belief system."  The policy mandates that officers will receive initial and ongoing training, including cultural diversity training and training on the laws governing search and seizure, and that the trainings will emphasize the need to respect the rights of all citizens to be free from unreasonable government

intrusion or police action.  As for complaints of racial profiling, SOP 34 states that "[a]ny person may file a complaint with the department if they feel they have been stopped or searched based on racial, ethnic or gender-based profiling, and no person shall be discouraged, intimidated, or coerced from filing such a complaint, or discriminated against because they have filed such a complaint. . . . A supervisor receiving such a report should forward it to the Internal Affairs Division Commander."

74.    Upon information and belief, Defendant Lopinto has not instituted any training program to implement SOP 34 and attempt to prevent racial profiling in connection with vehicle stops, or to teach JPSO deputies about the need for reasonable suspicion prior to conducting a traffic stop, or how to respond to citizen complaints of racial profiling.  JPSO records from April 27, 2018 through January 21, 2021 reflect that Defendant Naccari did not complete any required initial or ongoing training on racial profiling with the JPSO.

75.    Defendant Lopinto does not even require deputies to read the JPSO's racial profiling and traffic stops policies.  Defendant Naccari's acknowledgement of JPSO's standard operating procedures states only that he is aware the racial profiling and traffic stops policies are located on the JPSO's website and that it is his responsibility to read the policies.  However, Defendant Lopinto never required Defendant Naccari to attest to having read and understood the policies.  Defendant Lopinto has thus been deliberately indifferent in his duties to supervise and train Defendant Naccari.  JPSO's deficient acknowledgement form, which does not require its deputies to have read JPSO's policies, further demonstrates Defendant Lopinto's deliberate indifference to the Fourth Amendment rights of citizens in connection with traffic stops.

D.     **EJLD PD and JPSO Ignore Then Lie About**

**Mrs. and Mr. Suggs's Complaints About the Incident**

76.     On July 19, 2020, the day after the incident, Mrs. Suggs began making phone

calls to complain about how she had been treated by the Individual Defendants and to attempt

to locate her missing property.

77.     Mrs. Suggs first called the JPSO.  She called the JPSO dispatch on July 19, 2020

and reported the unlawful stop, the search of her purse, and the seizure of her personal

property.  Mrs. Suggs specifically referenced Defendant Naccari and Defendant Mikkelsen.

78.     Mrs. Suggs spoke initially with a woman from the JPSO who took all of the

information from Mrs. Suggs over the phone and said someone would get back to her.  Mrs.

Suggs later spoke with a man from the JPSO who said EJLD PD had her property and that he

otherwise would look into the matter and get back to her.  He never did, despite Mrs. Suggs's

calling again to find out the status.  No one from JPSO called Mrs. Suggs back after she was

directed to EJLD PD.

79.     Rather than forwarding Mrs. Suggs's concerns to Internal Affairs as required by

its SOP 34, JPSO directed Mrs. Suggs to EJLD PD without any investigation into the actions of

its own deputy.  JPSO did not record Mrs. Suggs's report of her complaint of racial profiling

and multiple Fourth Amendment violations during the encounter with Defendant Naccari, and

JPSO's Internal Affairs Division never investigated Mrs. Suggs's allegations.

80.     Based on the call from Mrs. Suggs to JPSO dispatch, Defendant Lopinto and

others at JPSO were aware of the Fourth Amendment violations that took place on July 18,

2020, and yet with deliberate indifference they decided to ignore the complaint about

Defendant Naccari's involvement in unconstitutional searches and seizures in connection with

a traffic stop.  Defendant Lopinto has therefore created a *de facto* policy of failing to supervise and discipline deputies in connection with unlawful traffic stops and related searches and seizures.

81.     Mrs. Suggs also called the EJLD PD and reported the incident.  After several calls she spoke with an officer who told her she could come down to the station and file a complaint.

82.     On July 20, 2020, two days after the incident, Mrs. and Mr. Suggs went to the EJLD PD and submitted written citizen complaints to the EJLD PD.  The citizen complaints span three handwritten pages and provide a near in time account of the incident.  The citizen complaints name two of the Individual Defendants involved in the traffic stop ("Michael Naccari" and "Downing, Jonathan").  In addition to submitting her complaint, Mrs. Suggs asked for her property back.  The officer she spoke with told her that all of her documentation had been returned to her during the stop.  This was false.

83.     When EJLD PD was asked about documentation regarding the status of any investigation into the illegal traffic stop EJLD PD officers had conducted, including asking for copies of the citizen complaints Mrs. and Mr. Suggs submitted to the EJLD PD, the department reported *multiple times* that no such complaints existed.  Those statements were false.

84.     During months of back-and-forth over public records requests, the EJLD PD's narrative regarding Mrs. Suggs's traffic stop and subsequent desire by Mrs. Suggs for an investigation was:  "As indicated in our prior response, Ms. Walker (Suggs), on one occasion following the traffic stop, came in person to the EJLD PD headquarters and spoke with our Internal Affairs Department Director, Capt. Donald Juneau, purporting her desire to file a complaint about her vehicle being repossessed.  She was given the paper complaint form but

shortly thereafter, returned from the parking lot with it, stating she was returning to Georgia and something to the effect of she did not want to bother with it.  No written complaint was filed by Ms. Walker (Suggs), and though the male accompanying her returned thereafter and indicated a desire to file a complaint 'on her behalf' our IAD Director informed him that in order to complete the investigation, the individual who was stopped or who interacted with the officer was a necessary party and that could not conduct a proper investigation brought by a third party on behalf of another in regards to an interaction in which he was not a party."

85. After multiple public records requests, including asking for an explanation of the process that went into searching for the citizen complaints, and for an affidavit under oath of Captain Donald Juneau ("Captain Juneau") confirming his version of events that Mrs. and Mr. Suggs never filed the citizen complaints, EJLD PD finally admitted that Mrs. and Mr. Suggs did file citizens' complaints.

86. Even though two of EJLD PD's officers were involved in the complained of incident involving multiple alleged instances of misconduct, including Defendant Downing who was explicitly named in Mrs. Suggs's complaint, Defendant Najolia and the EJLD PD decided initially to ignore Mrs. and Mr. Suggs's citizen complaints entirely.

87. Upon information and belief, only because of Mrs. Suggs's repeated inquiries about her and Mr. Suggs's citizen complaints, the EJLD PD finally took action on the complaints.  However, the so-called investigation was superficial and wholly inadequate.

88. On or about August 6, 2020 (approximately three weeks after the citizen complaints were filed), Captain Juneau examined Mrs. and Mr. Suggs's citizen complaints. Captain Juneau collected statements about the stop from Defendant Mikkelsen and Defendant

Downing.  However, no further documentation was obtained and Captain Juneau did not seek to interview Mrs. or Mr. Suggs, or Defendant Naccari.

89.     The Suggs's complaints were found to be unsubstantiated based on only the say-so of the individuals who were the subjects of the investigation.  No one from EJLD PD followed up with Mrs. and/or Mr. Suggs for further investigation.  No further communications were exchanged between Captain Juneau and Defendant Mikkelsen or Defendant Downing regarding the unlawful stop.  No further communications took place between Captain Juneau and Mrs. or Mr. Suggs.  Defendant Mikkelsen and Defendant Downing were not disciplined despite numerous policy violations in addition to Fourth Amendment violations.

90.     Instead, EJLD PD falsely represented that the complaints had never been submitted.  That Mrs. Suggs submitted a complaint that was later found in the EJLD PD's files only after repeated inquiries points not only to negligent recordkeeping, but to a pernicious intent to work against public accountability.  The EJLD PD's failure to promptly and meaningfully investigate Mrs. and Mr. Suggs's serious allegations of racial profiling, of a pretextual stop lacking any reasonable suspicion, of an unlawful search of a woman's purse, and of the theft of her private property, allows police misconduct by EJLD PD officers to persist unabated and contributes to the erosion of public confidence in law enforcement.

91.     Upon information and belief, EJLD PD has a persistent and widespread practice of not investigating citizen complaints concerning traffic stops, created and endorsed by Defendant Najolia through his function as the principal and final policymaker of the department.  Prior to 2020, EJLD PD did not bother to keep track of any citizen complaints. By failing to track citizen complaints or to conduct substantive investigations of citizen complaints concerning traffic stops, Defendant Najolia created and condoned a pattern of

police misconduct, including the high potential for pretextual racially motivated stops and unlawful searches and seizures during such stops, all while knowingly and deliberately ignoring the obvious harms naturally resulting from such unlawful conduct, including the constitutional violations EJLD PD officers committed with impunity on the evening of July 18, 2020.  Defendant Najolia's failure to meaningfully investigate and to discipline Defendant Mikkelsen and Defendant Downing is part of Defendant Najolia's official policy of failing to provide adequate training and supervision.

92.     When records regarding the traffic stop were requested from the JPSO, the department responded: "Good afternoon, Unfortunately we don't have any records regarding this individual.  You may have to contact the Levee District."

93.     Only after multiple and persistent contacts with JPSO regarding the stop were records obtained.  It turned out that despite initially claiming JPSO does not have "any" records of Mrs. Suggs's traffic stop, such records existed.  But they were sparse.  None of these records contain any information regarding why the Individual Defendants initially stopped Mrs. Suggs. The records lack descriptions of how the Individual Defendants conducted the traffic stop. They do not reference the seizure of Mrs. Suggs's personal property.

94.     The public should expect, at a minimum, that law enforcement officers will act in a lawful as well as courteous manner in connection with traffic stops.  The Individual Defendants manifestly failed to do so with Mrs. Suggs on July 18, 2020, and the policymakers in charge of them – Defendant Najolia and Defendant Lopinto – condoned their behavior by not meaningfully investigating it, and by not disciplining the Individual Defendants for their multiple Fourth Amendment violations as well as multiple violations of department policies.

## VI.     FEDERAL CLAIMS

### COUNT I

### 42 U.S.C. § 1983 – Unlawful Stop in Violation of the Fourth Amendment

### (Against the Individual Defendants)

95.     Mrs. Suggs hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

96.     To lawfully conduct a traffic stop under the Fourth Amendment, an officer must have reasonable suspicion based on specific and articulable facts that, together with objective and reasonable inferences, form the basis for suspecting that some sort of illegal activity occurred or is about to occur, before stopping the vehicle.  A mere hunch that illegal activity has occurred is insufficient grounds for an officer to lawfully pull over a vehicle.

97.     The Individual Defendants stopped Mrs. Suggs without reasonable articulable suspicion justifying seizure of any of the occupants of Mrs. Suggs's vehicle.  None of the Individual Defendants observed Mrs. Suggs fail to signal a turn when one was legally required.

98.     The Individual Defendants had no articulable facts on which to base a reasonable suspicion that Mrs. Suggs committed any traffic violation when they pulled her over.  The Individual Defendants' mere hunch that Mrs. Suggs may have violated the Louisiana traffic code or committed a crime, or was about to, especially any hunch based on her race as a Black American, was and is legally insufficient to justify initiating a traffic stop under Fourth Amendment jurisprudence.

99.     Upon information and belief, the Individual Defendants pulled over Mrs. Suggs because they saw that she and Mr. Suggs are Black.

100.    At the time that the Individual Defendants stopped Mrs. Suggs, they were operating under the color of law.  They were wearing uniforms of the EJLD PD and JPSO and held themselves out as police officers/deputies of their respective departments.

101.    The Individual Defendants' conduct was motivated by an evil motive or intent and/or involved reckless or callous indifference to Mrs. Suggs's federally protected rights.

102.    No reasonable officer in the Individual Defendants' position would have believed reasonable suspicion or probable cause existed to stop Mrs. Suggs.

103.    The Individual Defendants' conduct in pulling over Mrs. Suggs thus violated Mrs. Suggs's clearly established Fourth Amendment right to be free of unreasonable searches and seizures, of which reasonable officers would know or should know.

104.    As a direct and proximate result of the Individual Defendants' conduct as set forth above, Mrs. Suggs suffered damages in an amount to be proven at trial.

105.    As a direct and proximate result of the Individual Defendants' conduct as set forth above, Mrs. Suggs suffered and continues to suffer embarrassment, humiliation, pain, and suffering.

## COUNT II

## 42 U.S.C. § 1983 – Unlawful Extension of Detention in Violation of the

## Fourth Amendment

### (Against the Individual Defendants)

106.    Mrs. Suggs hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

107.    It was clearly established as of July 18, 2020 that a traffic stop may last no longer than is necessary to effectuate its purpose.

108.    To further detain a suspect during a traffic stop under the Fourth Amendment, an officer must have reasonable suspicion based on specific and articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the person detained is engaged in criminal activity.  Police officers may not detain people, or engage in searches and seizures, if they do not have a reason to believe the extended detention, search, or seizure, would lead to evidence relating to the reason for the stop.

109.    Nothing arose during the Individual Defendants' detention of Mrs. Suggs and her vehicle that justified a forty to forty-five minute detention.

110.    There was no lawful justification for extending the stop beyond an initial request for Mrs. Suggs's identification and paperwork.  There was no lawful justification to demand that Mr. Suggs exit the vehicle and pat him down and search his pockets, or for the extended search of Mrs. Suggs's purse and removal of bullets from her gun, all of which unnecessarily extended the length of the stop.

111.    Mrs. Suggs's traffic stop was impermissibly extended without reasonable suspicion or probable cause and was therefore unlawful and violative of Mrs. Suggs's rights under the Fourth Amendment.

112.    At the time that the Individual Defendants impermissibly extended the detention of Mrs. Suggs, they were operating under the color of law.  They were wearing uniforms of the EJLD PD and JPSO and held themselves out as officers/deputies of their respective departments.

113.    The Individual Defendants' conduct was motivated by an evil motive or intent and/or involved reckless or callous indifference to Mrs. Suggs's federally protected rights.

114.    No reasonable officer in the Individual Defendants' position would have believed that lawful justification existed for the pat down and pocket search of Mr. Suggs.

115.    No reasonable officer in the Individual Defendants' position would have believed that lawful justification existed for the extensive search of Mrs. Suggs's purse and seizure of several bullets.

116.    The Individual Defendants' conduct thus violated Mrs. Suggs's clearly established rights, of which reasonable officers would know or should know.

117.    As a direct and proximate result of the Individual Defendants' conduct as set forth above, Mrs. Suggs suffered damages in an amount to be proven at trial.

118.    As a direct and proximate result of the Individual Defendants' conduct as set forth above, Mrs. Suggs suffered and continues to suffer embarrassment, humiliation, pain, and suffering.

## COUNT III

## 42 U.S.C. § 1983 – Unreasonable Search of Mrs. Suggs's Purse in Violation of the Fourth Amendment

### (Against the Individual Defendants)

119.    Mrs. Suggs hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

120.    On July 18, 2020, the Individual Defendants searched Mrs. Suggs's purse in violation of her rights against unreasonable searches established in the Fourth Amendment.

121.    A search occurs when a police officer invades an area where a person has a reasonable expectation of privacy.  A person has a reasonable expectation of privacy where the person exhibits an actual (subjective) expectation of privacy, and the expectation is one that

society is prepared to recognize as reasonable.  Mrs. Suggs had an actual, subjective, expectation of privacy as to her purse and the contents therein, and society generally recognizes individuals' privacy interests in their belongings.

122.   It was clearly established as of July 18, 2020 that to conduct an investigatory search of a closed container during a routine traffic stop, an officer who lacks probable cause must point to specific and articulable facts that reasonably warrant the inference that a particular person is committing a crime, and that investigatory searches "must be brief, minimally intrusive, and 'reasonably related in scope to the justification for [their] initiation.'" *Club Retro LLC v. Hilton*, 568 F.3d 181, 209 (5th Cir 2009) (citation omitted).

123.   The purse search occurred after Mrs. Suggs was illegally stopped.  The Individual Defendants did not possess probable cause or reasonable suspicion sufficient to justify a warrantless search of Mrs. Suggs's purse.

124.   The purse search was not minimally intrusive, as it was conducted throughout Mrs. Suggs's purse and took several minutes – longer than necessary to remove a gun.

125.   Nor was the search justified as a valid safety search.  There was no basis for Defendant Naccari to believe that Mrs. Suggs posed an imminent threat to any Defendant's safety.  At the time Defendant Naccari demanded Mrs. Suggs's purse, the purse was fully zipped and located on the floor in the back of Mrs. Suggs's car.  Mrs. Suggs did not reach for her purse or make any movement indicative of turning towards the back of the car before being directed to do so.

126.   At all times related to this action, Mrs. Suggs was the legal owner of the purse searched on July 18, 2020 and its contents.

127.    The Individual Defendants did not possess a lawfully issued warrant for the search of Mrs. Suggs's purse.

128.    The Individual Defendants did not possess a lawfully issued warrant or probable cause for an arrest of Mrs. Suggs.

129.    There was no basis to justify the search of Mrs. Suggs's purse in the absence of a warrant or an arrest.

130.    No exception to the warrant requirement existed that justified the search of Mrs. Suggs's purse.

131.    Mrs. Suggs did not consent to the purse search.  In handing over her purse to Defendant Naccari, Mrs. Suggs understood based on Defendant Naccari's words and the surrounding circumstances that she was legally required to do so.

132.    Defendant Naccari did not inform Mrs. Suggs of her right to refuse consent to the purse search.

133.    In the alternative, the Individual Defendants exceeded the scope of any consent they had for the search.  While handing the purse to Defendant Naccari, Mrs. Suggs clearly instructed him not to go into her purse outside of her presence.

134.    The search of Mrs. Suggs's purse took place outside of her presence.

135.    Mrs. Suggs was harmed by the Individual Defendants' search of her private personal property in violation of her Fourth Amendment rights.

136.    At the time that the Individual Defendants searched Mrs. Suggs's purse, they were operating under the color of law.  They were wearing uniforms of the EJLD PD and JPSO and held themselves out as officers/deputies of their respective departments.

137.    The Individual Defendants' conduct was motivated by an evil motive or intent and/or involved reckless or callous indifference to Mrs. Suggs's federally protected rights.

138.    No reasonable officer in the Individual Defendants' position would have believed reasonable suspicion or probable cause existed to search Mrs. Suggs's purse.

139.    No reasonable officer in the Individual Defendants' position would have believed that Mrs. Suggs posed an imminent threat to any of the Individual Defendants' safety.

140.    In the alternative, even if a reasonable officer in the Individual Defendants' position would have believed that Mrs. Suggs posed an imminent threat to any of the Individual Defendants' safety, there was no need to search the purse and instead Defendant Naccari could have ensured the Individual Defendants' safety by simply removing Mrs. Suggs's purse from the vehicle.

141.    The Individual Defendants' conduct in thoroughly searching Mrs. Suggs's purse thus violated Mrs. Suggs's clearly established Fourth Amendment right to be free of unreasonable searches and seizures, of which reasonable officers would know or should know.

142.    As a direct and proximate result of the Individual Defendants' conduct as set forth above, Mrs. Suggs suffered damages in an amount to be proven at trial.

143.    As a direct and proximate result of the Individual Defendants' conduct as set forth above, Mrs. Suggs suffered interference with her property interest and suffered and continues to suffer embarrassment, humiliation, pain and suffering.

## COUNT IV

## 42 U.S.C. § 1983 – Unreasonable Seizure of Mrs. Suggs's Personal Property in Violation of the Fourth Amendment

### (Against the Individual Defendants)

144.    Mrs. Suggs hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

145.    On July 18, 2020, the Individual Defendants seized and permanently deprived Mrs. Suggs of bullets from her lawfully owned and possessed gun, and of her valid Georgia driver's license, in violation of her Fourth Amendment rights.

146.    It was clearly established as of July 18, 2020 that an officer may not seize personal property during a traffic stop absent a warrant, circumstances establishing an exception to the warrant requirement, or in connection with the arrest of the owner of the personal property.

147.    On July 18, 2020 Mrs. Suggs was the legal owner of the Georgia driver's license and bullets that were seized by the Individual Defendants.

148.    At the time that the Individual Defendants illegally seized Mrs. Suggs's bullets and valid Georgia driver's license, they were operating under the color of law.  They were wearing uniforms of the EJLD PD and JPSO and held themselves out as officers/deputies of their respective departments.

149.    The Individual Defendants' conduct was motivated by an evil motive or intent and/or involved reckless or callous indifference to Mrs. Suggs's federally protected rights.

150.    The Individual Defendants did not possess a lawfully issued warrant for the seizure of any of Mrs. Suggs's personal property.

151.    The Individual Defendants did not possess a lawfully issued warrant or probable cause for an arrest of Mrs. Suggs.

152.    The Individual Defendants had no lawful justification for the seizure and retention of Mrs. Suggs's bullets and Georgia driver's license.

153.    No exception to the warrant requirement for seizure of Mrs. Suggs's property justified the seizure.

154.    No reasonable officer in the position of the Individual Defendants would have believed that there was lawful justification to retain Mrs. Suggs's bullets and Georgia driver's license at the conclusion of the stop.

155.    The retention by the Individual Defendants of Mrs. Suggs's bullets and driver's license thus violated Mrs. Suggs's clearly established rights, of which reasonable officers would know or should know.

156.    As a direct and proximate result of the Individual Defendants' conduct, Mrs. Suggs was damaged in an amount to be proven at trial, including the replacement cost of her unlawfully seized property.  As a direct and proximate result of the Individual Defendants' conduct as set forth above, Mrs. Suggs suffered and continues to suffer embarrassment, humiliation, pain and suffering.

## COUNT V

## 42 U.S.C. § 1983 - *Monell* Liability for

## Failure to Train, Failure to Supervise, and Failure to Discipline

### (Against Defendant Najolia)

157.    Mrs. Suggs hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

158.    Section 1983 permits municipal liability for inadequate police training where the failure to train amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact.  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  Mrs. Suggs brings this claim against Defendant Najolia for the failure to train Defendant Mikkelsen and Defendant Downing in when and how to properly conduct traffic stops, searches incident to traffic stops, and seizures incident to traffic stops, pursuant to the legal requirements set forth by the Fourth Amendment.

159.    Upon information and belief based upon records provided by EJLD PD in response to public records requests, Defendant Najolia does not train his officers on the standards that govern whether, when, and how to conduct a traffic stop without violating the Fourth Amendment.

160.    Defendant Najolia did not train Defendant Mikkelsen and Defendant Downing on the standards that govern traffic stops and related searches and seizures, despite traffic stops being a recurring feature of these Defendants' duties.

161.    Defendant Mikkelsen and Defendant Downing routinely conduct traffic stops, and searches and seizures in connection with such stops.

162.    A highly predictable consequence of Defendant Najolia's decision to provide no training to his police force on when it is lawful to stop a vehicle, and when and how to perform traffic stop-based searches and seizures in line with the Fourth Amendment, is that EJLD PD police officers will violate individuals' Fourth Amendment rights in connection with traffic stops.

163.    Even if Defendant Najolia had an official traffic stop policy in place as of July 18, 2020, he nevertheless did nothing to ensure the policy was followed by his officers.

Defendant Najolia's failure to train officers on how to conduct traffic stops and related searches and seizures without violating the Fourth Amendment caused Mrs. Suggs's rights to be violated, repeatedly, as described above.

164.    Given the frequency with which EJLD PD officers conduct traffic stops (approximately 2,691 traffic stop citations issued in the past six years), Defendant Najolia's electing to not provide any traffic stop training amounts to deliberate indifference to the rights of individuals subjected to the traffic stops, including Mrs. Suggs, because the potential for Fourth Amendment violations was obvious and highly predictable to Defendant Najolia.

165.    Defendant Najolia's failure to train constitutes Defendant Najolia's official policy and custom for the EJLD PD.  Given the obvious need to train police officers who routinely conduct traffic stops on the constitutional constraints on traffic stops and related searches and seizures, Defendant Najolia's failure to train was deliberately indifferent to Mrs. Suggs's constitutional rights. *See Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 624-25 (5th Cir. 2018).

166.    The failure to train Defendant Mikkelsen and Defendant Downing resulted in injury to Mrs. Suggs, in the form of subjecting her to an unconstitutional stop, lengthy detention, search of her purse, and seizure of her property.  Defendant Najolia, through the failure to train Defendant Mikkelsen and Defendant Downing, directly and proximately caused at least some of the constitutional violations Mrs. Suggs was subjected to and was the moving force behind those constitutional violations.

167.    Defendant Najolia has a policy, custom, and pattern of tacit approval of police misconduct created in part by a failure to track and investigate citizen complaints of misconduct and discipline his officers for policy and constitutional violations.  EJLD PD's false

statements that Mrs. and Mr. Suggs did not file citizen complaints with EJLD PD point to
Defendant Najolia's absconding of the responsibilities to initiate a proper internal investigation
of Defendant Mikkelsen's and Defendant Downing's improper actions on the evening of July
18, 2020.  Defendant Najolia was grossly negligent, reckless, and deliberate, such that
continued police misconduct was almost inevitable or substantially certain to result.

168.    Defendant Najolia did not discipline Defendant Mikkelsen and Defendant
Downing for their violations of written policies and violations of Mrs. Suggs's rights.

169.    Upon information and belief, it is a policy and/or custom of Defendant Najolia
to inadequately supervise police officers by not meaningfully investigating complaints of
misconduct in connection with traffic stops and by not disciplining officers who violate
department policies in connection with traffic stops.

170.    As a result of these polices and/or customs, Defendant Mikkelsen and Defendant
Downing believed their actions would not be monitored properly by supervisory officers and
that their misconduct would be tolerated.

171.    As a result of these policies and/or customs, Defendant Mikkelsen and
Defendant Downing violated Mrs. Suggs's Fourth Amendment rights.

172.    Defendant Najolia's lack of supervision and discipline in connection with traffic
stops was obviously inadequate and was likely to, and did, lead to constitutional violations.

173.    Defendant Najolia's policy and/or custom of not investigating complaints
concerning traffic stops and not disciplining officers who violate policies in connection with
traffic stops amounted to deliberate indifference to Mrs. Suggs's Fourth Amendment rights.

<u>**COUNT VI**</u>

<u>**42 U.S.C. § 1983 -** *Monell* **Liability for**</u>

<u>**Failure to Train, Failure to Supervise, and Failure to Discipline**</u>

**(Against Defendant Lopinto)**

174.    Mrs. Suggs hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

175.    Section 1983 permits liability for inadequate police training where the failure to train amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact.  *Harris*, 489 U.S. at 388.  Mrs. Suggs brings this claim against Defendant Lopinto for the failure to train Defendant Naccari in when and how to properly conduct traffic stops, searches incident to traffic stops, and seizures incident to traffic stops, pursuant to the legal requirements set forth by the Fourth Amendment.

176.    Upon information and belief based upon records provided by JPSO in response to public records requests, Defendant Lopinto does not train deputies on the standards that govern whether, when, and how to conduct a traffic stop without violating the Fourth Amendment.

177.    Defendant Lopinto did not train Defendant Naccari on the standards that govern traffic stops and related searches and seizures despite traffic stops being a recurring feature of Defendant Naccari's duties.

178.    Defendant Naccari routinely conducts traffic stops, and searches and seizures in connection with such stops.

179.    A highly predictable consequence of Defendant Lopinto's decision to provide no training to his deputies on when it is lawful to stop a vehicle, and how to perform traffic stop-

based searches and seizures in line with the Fourth Amendment is that JPSO officers will violate individuals' Fourth Amendment rights in connection with traffic stops.

180.    Even if Defendant Lopinto had an official traffic stop policy in place as of July 18, 2020, he nevertheless did nothing to ensure the policy was followed by deputies. Defendant Lopinto's failure to train his deputies on how to conduct traffic stops and related searches and seizures without violating the Fourth Amendment caused Mrs. Suggs's rights to be violated, repeatedly, as described above.

181.    Given the frequency with which JPSO officers conduct traffic stops (approximately 1,840 traffic summonses and tickets issued in 2019 and 2020), electing to not provide any traffic stop training amounts to Defendant Lopinto's deliberate indifference to the rights of individuals subjected to the traffic stops, including Mrs. Suggs, because the potential for Fourth Amendment violations was obvious and highly predictable to Defendant Lopinto.

182.    Defendant Lopinto's failure to train constitutes Defendant Lopinto's official policy and custom for the JPSO.  Given the obvious need to train police officers who routinely conduct traffic stops on the constitutional constraints on traffic stops and related searches and seizures, Defendant Lopinto's failure to train was deliberately indifferent to Mrs. Suggs's constitutional rights.  *See Littell*, 894 F.3d at 624-25.

183.    The failure to train Defendant Naccari resulted in injury to Mrs. Suggs, in the form of subjecting her to an unconstitutional stop, lengthy detention, search of her purse, and seizure of her property.  Defendant Lopinto, through the failure to train Defendant Naccari, directly and proximately caused at least some of the constitutional violations Mrs. Suggs was subjected to and was the moving force behind those constitutional violations.

184.    Defendant Lopinto has a policy, custom, and pattern of tacit approval of police misconduct created in part by a failure to track and investigate citizen complaints of misconduct and discipline deputies for policy and constitutional violations.  Defendant Lopinto's failure to call Mrs. Suggs back after she placed several calls to the JPSO to inform the JPSO of Defendant Naccari's egregious conduct point to Defendant Lopinto's absconding of the responsibilities to initiate a proper internal investigation of Defendant Naccari's improper actions on the evening of July 18, 2020.  Defendant Lopinto was grossly negligent, reckless, and deliberate, such that continued misconduct by those under his supervision was almost inevitable or substantially certain to result.

185.    Defendant Lopinto did not discipline Defendant Naccari for his violations of written policies and violations of Mrs. Suggs's rights.

186.    Upon information and belief, it is as a policy and/or custom of Defendant Lopinto to inadequately supervise deputies by not meaningfully investigating complaints of misconduct in connection with traffic stops, and by not disciplining deputies who violate department policies in connection with traffic stops.

187.    As a result of these policies and/or customs, Defendant Naccari believed his actions would not be monitored properly by supervisory officers and that his misconduct would be tolerated.

188.    As a result of these policies and/or customs, Defendant Naccari violated Mrs. Suggs's Fourth Amendment rights.

189.    Defendant Lopinto's lack of supervision and discipline in connection with traffic stops was obviously inadequate and was likely to, and did, lead to constitutional violations.

190.     Defendant Lopinto's policy and/or custom of not investigating complaints concerning traffic stops and not disciplining deputies who violate policies and constitutional rights in connection with traffic stops amounted to deliberate indifference to Mrs. Suggs's Fourth Amendment rights.

## COUNT VII

### Declaratory Judgment

**(Against the Individual Defendants, Defendant Najolia, and Defendant Lopinto)**

191.     Mrs. Suggs hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

192.     There is an actual controversy between the parties relating to their legal rights and duties under the U.S. Constitution.

193.     In particular, Mrs. Suggs asserts that the Individual Defendants violated her Fourth Amendment legal rights.  Mrs. Suggs also asserts that Defendant Najolia and Defendant Lopinto have ongoing policies and/or customs of failing to train officers/deputies on traffic stops and failing to properly investigate complaints of misconduct and supervise and discipline officers/deputies who violate policies and constitutional rights.

194.     Mrs. Suggs therefore seeks a declaration of the rights and duties of the parties under the U.S. Constitution pursuant to 28 U.S.C. § 2201 and requests a speedy hearing pursuant to Rule 57 of the Federal Rules of Civil Procedure.

## VII.   STATE CLAIMS

## COUNT VIII

## False Imprisonment and False Arrest

### (Against the Individual Defendants)

195.    Mrs. Suggs hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

196.    The Individual Defendants detained and imprisoned Mrs. Suggs against her will.

197.    As discussed above, the Individual Defendants did not have a warrant to arrest Mrs. Suggs and they had no articulable facts on which to base a reasonable suspicion that Mrs. Suggs had committed any offense.

198.    The Individual Defendants intentionally stopped Mrs. Suggs against her will and held her captive for forty to forty-five minutes while she was conscious that she was unable to leave the Individual Defendants' presence, or her vehicle, or the intersection of Little Farms Avenue and Ivy Street due to the Individual Defendants' display of police authority.

199.    An officer may detain a suspect for an extended period during a traffic stop only when there is reasonable suspicion based on specific and articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the person detained is engaged in criminal activity.  The Individual Defendants lacked reasonable suspicion to extend Mrs. Suggs's detention, as there was no evidence of any criminal activity.

200.    The stop was impermissible at its inception, and impermissibly extended without reasonable suspicion or probable cause.  Therefore, the Individual Defendants acted with conscious desire or knowledge to a substantial certainty that Mrs. Suggs would be

confined to the area of Little Farms Avenue and Ivy Street when they restricted Mrs. Suggs's freedom of movement.

201.    The Individual Defendants' conduct in falsely arresting and imprisoning Mrs. Suggs was intentional.

202.    As a direct and proximate result of the Individual Defendants' conduct as set forth above, Mrs. Suggs suffered deprivation of her property taken during the false imprisonment and confinement, other monetary damages in an amount to be proven at trial, and suffered and continues to suffer embarrassment, humiliation, pain, and suffering.

## COUNT IX

## Conversion

### (Against the Individual Defendants)

203.    Mrs. Suggs hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

204.    On July 18, 2020, the Individual Defendants intentionally and wrongfully took possession of and retained bullets taken from the inside of Mrs. Suggs's lawfully possessed gun, and her Georgia driver's license.  At all times related to this action, Mrs. Suggs was the legal owner of the bullets and driver's license that the Individual Defendants seized and never returned.  By seizing and permanently depriving Mrs. Suggs of possession of her property, the Individual Defendants committed the tort of conversion.

205.    The Individual Defendants wrongfully kept possession of the bullets and driver's license, and had no legal justification for not returning them to Mrs. Suggs.  Mrs. Suggs did not consent to or authorize the taking of her bullets and driver's license.  The Individual Defendants therefore acquired Mrs. Suggs's property in an unauthorized manner.

206.     Under Louisiana Code of Criminal Procedure Article 215.1, an officer who has seized a weapon during a stop may only keep the seized weapon "until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person." By extension, the bullets located inside a gun must also be returned.

207.     As a direct and proximate result of the Individual Defendants' conduct as set forth above, Mrs. Suggs suffered deprivation of her property and other monetary damages in an amount to be proven at trial, and suffered and continues to suffer embarrassment, humiliation, pain, and suffering.

## COUNT X

## Negligence

## (Against the Individual Defendants)

## (In the Alternative)

208.     Mrs. Suggs hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

209.     Mrs. Suggs asserts this claim only in the alternative that the Individual Defendants did not to some degree intentionally take possession of and retain Mrs. Suggs's bullets and Georgia driver's license.

210.     On July 18, 2020, the Individual Defendants took possession of Mrs. Suggs's bullets taken from the inside of Mrs. Suggs's lawfully possessed gun, and her Georgia driver's license.  The Individual Defendants did not return these items to Mrs. Suggs upon completion of the traffic stop despite its completion.

211.     The Individual Defendants owed a duty to Mrs. Suggs to act reasonably with regard to her seized possessions, including by securely storing and promptly returning them at the completion of the traffic stop.

212.     The Individual Defendants breached their duty to Mrs. Suggs when they failed to return her possessions at the completion of the stop.

213.     As a direct and proximate result of the Individual Defendants' negligence as set forth above, Mrs. Suggs suffered deprivation of her property and other monetary damages in an amount to be proven at trial, and suffered and continues to suffer embarrassment, humiliation, pain, and suffering.

## COUNT XI

### Invasion of Privacy

**(Against the Individual Defendants)**

214.     Mrs. Suggs hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

215.     Mrs. Suggs had a privacy interest in the contents of her zipped purse. The Individual Defendants intentionally and unreasonably intruded upon that interest by conducting a thorough search of the purse outside of her presence despite her objection to such a search.

216.     There was no legal basis for the search of Mrs. Suggs's purse.  Upon information and belief, it was searched in the hope of finding evidence of a crime unrelated to the purported basis for the traffic stop.  Searching a zipped purse during a traffic stop without lawful basis is a serious invasion of privacy.

217.     Mrs. Suggs's privacy interest in the contents of her zipped purse during a traffic stop outweighs the Individual Defendants' interest in rummaging through her purse to look for evidence of crime without a lawful justification for doing so.

218.     As a direct and proximate result of the Individual Defendants' conduct as set forth above, Mrs. Suggs suffered deprivation of her bullets located inside her purse, and suffered and continues to suffer embarrassment, humiliation, pain, and suffering.

## COUNT XII

### Negligent Hiring, Supervision, and Retention of Defendant Mikkelsen

### (Against Defendant Najolia)

219.     Mrs. Suggs hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

220.     Before working for the EJLD PD, Defendant Mikkelsen was employed by the NOPD.  In March 2019, Defendant Mikkelsen was involved in an unauthorized vehicle pursuit which resulted in the death of three individuals.

221.     The NOPD initiated a formal investigation against Defendant Mikkelsen, which revealed that Defendant Mikkelsen was involved in multiple other similar incidents of unauthorized pursuit.  Defendant Mikkelsen has a history of policy violations.

222.     Defendant Najolia was aware of Defendant Mikkelsen's prior police misconduct, as it was widely and publicly reported by various news outlets.  Defendant Mikkelsen reported his misconduct on his hiring application, stating that he was "terminated" from his prior position.  A reference check by EJLD PD staff to Defendant Mikkelsen's prior employer, the NOPD, revealed that he was terminated due to multiple policy violations.  Yet, despite all of this evidence, Defendant Najolia decided to hire Defendant Mikkelsen, an

incompetent employee.  Defendant Najolia did not provide Defendant Mikkelsen with any additional training to help him improve his ability to follow police procedures or to ensure he conducts traffic stops legally going forward.

223.    Defendant Najolia violated his duty of reasonable care when he hired Defendant Mikkelsen.

224.    Defendant Mikkelsen's documented history of misconduct put, or should have put, Defendant Najolia on notice that he was likely to engage in conduct that would violate the civil and constitutional rights of the public – such as the conduct complained of by Mrs. Suggs herein.

225.    When he conducted Mrs. Suggs's traffic stop, alongside Defendant Downing and Defendant Naccari, Defendant Mikkelsen was acting within the course and scope of his employment and for the benefit of EJLD PD.  Defendant Mikkelsen wore his police uniform and badge and used his police-issued vehicle to stop Mrs. Suggs.  Defendant Mikkelsen's unlawful stop of Mrs. Suggs was motivated by a desire to further the goals of his employer, the EJLD PD.

226.    Defendant Najolia's conduct amounts to negligent hiring, training, supervision, and retention of incompetent employees, in violation of Louisiana state law.

227.    As a direct and proximate result of Defendant Najolia's negligent hiring, training, supervision, and retention of Defendant Mikkelsen, Mrs. Suggs suffered and continues to suffer embarrassment, humiliation, pain, and suffering.

## VIII.   <u>JURY DEMAND</u>

228.    Mrs. Suggs hereby requests a jury in this matter.

## IX.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Alexis Suggs respectfully requests that the Court enter judgment in her favor and against Defendant Alex Mikkelsen, Defendant Jonathan Downing, Defendant Michael John Naccari III, Defendant Kerry Najolia, and Defendant Joseph P. Lopinto III, and award the following relief:

A.    A declaration that the Individual Defendants' conduct violated the Fourth Amendment to the U.S. Constitution;

B.    Compensatory and special damages;

C.    Punitive damages under 42 U.S.C. § 1983;

D.    Any and all equitable relief as deemed appropriate by this Court;

E.    Attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

F.    Any other relief this Court deems just and proper.

Respectfully submitted,

Dated:  July 12, 2021

/s/ *Robert J. Dressel*
Robert J. Dressel (LA Bar No. 35757)
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
Facsimile: (504) 589-9701
rdressel@barrassousdin.com

Nora Ahmed
(*pro hac vice* admission to be applied for)
American Civil Liberties Union of Louisiana
1340 Poydras Street, Suite 2160
New Orleans, Louisiana 70112
Telephone: (504) 444-6046
nahmed@laaclu.org

and

David J. Berger
(*pro hac vice* admission to be applied for)
Douglas W. McManaway
(*pro hac vice* admission to be applied for)
Steven Chizen
(*pro hac vice* admission to be applied for)
Yana Pavlova
(*pro hac vice* admission to be applied for)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 493-6811
dberger@wsgr.com
dmcmanaway@wsgr.com
schizen@wsgr.com
ypavlova@wsgr.com

*Attorneys for Plaintiff Alexis Suggs*